UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| **UNITED TRANSPORTATION UNION,** | ) ) ) | |
| Plaintiff, | ) ) ) | |
| vs. | ) ) ) | |
| **BIRMINGHAM SOUTHERN RAILROAD COMPANY; TRANSTAR, INC.** | ) ) ) ) ) | **CASE NO. 2:11-cv-04128-SLB** |
| Defendants. | ) ) ) | |
| **BIRMINGHAM SOUTHERN RAILROAD COMPANY,** | ) ) ) ) | |
| Counterclaim plaintiff, | ) ) ) | |
| vs. | ) ) ) | |
| **UNITED TRANSPORTATION UNION, and CAROL J. ZAMPERINI,** | ) ) ) ) | |
| Counterclaim defendants. | ) | |

## MEMORANDUM OPINION

This case is currently before the court on counterclaim defendant United Transportation Union's Motion to Dismiss Counts II through VII of BSRR's Counterclaim ("Motion to Dismiss"), (doc. 18).[1] Upon consideration of the submissions, the arguments of

---

[1] Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.

counsel, and the relevant law, the court finds that the Motion to Dismiss, (doc. 18), is due to be granted.

## I.  STANDARD OF REVIEW

Under Fed. R. Civ. P. 12(b)(6), a party may move the court to dismiss a case based on a failure to state a claim upon which relief can be granted.  When deciding a motion to dismiss under Rule 12(b)(6), the court "must accept the allegations set forth in the complaint as true." *Gonzalez v. McNary*, 980 F.2d 1418, 1419 (11th Cir. 1993); *see also Rivell v. Private Health Care Sys., Inc.*, 520 F.3d 1308, 1309 (11th Cir. 2008).

> The allegations in the complaint are taken as true and construed in the light most favorable to the plaintiffs. [*Hoffman-Pugh v. Ramsey*, 312 F.3d 1222, 1225 (11th Cir. 2002).]  However, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1965, 167 L. Ed. 2d 929 (2007); *see also Watts v. Florida Int'l Univ.*, 495 F.3d 1289, 1295 (11th Cir. 2007).  "The Supreme Court's most recent formulation of the pleading specificity standard is that 'stating such a claim requires a complaint with enough factual matter (taken as true) to suggest' the required element." *Watts*, 495 F.3d at 1295 (quoting *Twombly*, 127 S. Ct. at 1965).  This rule does not "impose a probability requirement at the pleading stage." *Twombly*, 127 S. Ct. at 1965.  Instead, the standard "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" of the required element. *Id*.  "It is sufficient if the complaint succeeds in 'identifying facts that are suggestive enough to render [the element] plausible.'" *Watts*, 495 F.3d at 1296 (quoting *Twombly*, 127 S. Ct. at 1965).

*Rivell*, 520 F.3d at 1309-10.

"[T]he threshold that a complaint must meet to survive a motion to dismiss is 'exceedingly low.'" *Holley v. City of Roanoke*, 162 F. Supp. 2d 1335, 1338 (M.D. Ala. 2001) (quoting *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 703 (11th Cir. 1985)).

However, taking the facts as true, a court may grant a motion to dismiss when, "on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action." *Marshall County Bd. of Educ. v. Marshall County Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir. 1993) (citations omitted). A court need not accept legal conclusions as true, but only well-pleaded factual allegations are entitled to an assumption of truth. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009) (citation omitted).

## II.  FACTUAL AND PROCEDURAL HISTORY[2]

### A.  Previously Paid COLA Dispute

Counterclaim plaintiff Birmingham Southern Railroad Company ("BSR") is a common railroad carrier engaged in interstate commerce and a "carrier" within the meaning of the Railway Labor Act ("RLA"), 45 U.S.C. § 151 *et seq*. (Doc. 6 ¶ 3.) Counterclaim defendant United Transportation Union ("UTU") is a national labor organization and the collective bargaining representative for four classes of BSR employees. (*Id.* ¶ 4.) Between July 2004 and April 2005, UTU and BSR entered into four local collective bargaining agreements (the "Local Agreements") – one for each craft of BSR employee represented by UTU.[3] (*Id.* ¶ 35.) The Local Agreements provided for the payment of specified general

---

[2] The facts are for purposes of the motion to dismiss only. They may not be the actual facts.

[3] Many railroads negotiate their labor agreements with UTU at the national level through a single bargaining representative. (Doc. 6 ¶ 34.) Other railroads, like BSR, customarily negotiate their labor agreements with UTU individually, entering into what are known as "local" agreements. (*Id.*)

wage increases and cost-of-living payments. (*Id.* ¶ 36.) The Local Agreements also provided that cost-of-living allowances ("COLA") payable thereunder "will be disposed of in the manner provided in the next national agreement after 2004." (*Id.*)

The "next national agreement" (the "National Agreement") came into effect on July 1, 2008. (*Id.* ¶ 37.) The National Agreement contained provisions relating to COLA previously paid to UTU-represented employees. (*Id.*) In light of the National Agreement's treatment of previously paid COLA, BSR believed that it was entitled to recover COLA previously paid to its UTU-represented employees under the Local Agreements. (*Id.* ¶ 38.) BSR proposed to deduct $45.00 from the future paychecks of each UTU-represented employee until the requisite amount was fully recovered. (*Id.*) UTU objected to BSR's proposal, contending that BSR was not authorized to recover previously paid COLA . (*Id.* ¶ 39.)

After a series of unsuccessful negotiations, BSR and UTU agreed to resolve their COLA dispute in arbitration under the provisions of Section 7 of the RLA, 45 U.S.C. § 157. (*Id.* ¶ 40-41.) Accordingly, BSR and UTU entered into an arbitration agreement (the "Arbitration Agreement") on September 17, 2008, which created a tripartite arbitration board known as Board 594. (*Id.* ¶ 42; *see* doc. 6-1.) The Arbitration Agreement provided that Board 594 shall consist of Francis X. Quinn ("Quinn"), UTU's appointed arbitrator; Joseph A. Cassidy, Jr. ("Cassidy"), BSR's appointed arbitrator; and counterclaim defendant Carol J. Zamperini ("Zamperini"), the "Chairwoman." (Doc. 6 ¶ 9; doc. 6-1 at 1.) Zamperini was

4

intended to serve as Board 594's neutral arbitrator. (Doc. 6-1 ¶ 11.) The Arbitration Agreement also provided that Board 594's award "will constitute a valid and binding award provided a majority of the members of the Board have affixed their signatures to the award." (Doc. 6-1 at 2.)

Board 594 conducted a hearing and rendered its award, labeled as "Award No. 1," on November 28, 2008. (*Id*. ¶ 47.) In Award No. 1, Board 594 concluded that BSR was not entitled to recoup previously paid COLA from its UTU-represented employees. (*Id*. ¶ 49.) BSR petitioned for review of Award No. 1 in the Northern District of Alabama pursuant to Section 9 of the RLA, 45 U.S.C. § 159. (*Id*. ¶ 50.) The petition was denied on August 12, 2010. (*Id*.)

**B.     Discontinuance of COLA Prospectively/Interpretation of Award No. 1**

A "separate and distinct" COLA dispute arose between BSR and UTU concerning the interpretation of the Local Agreements. (*Id*. ¶ 51.) BSR interpreted the Local Agreements as authorizing the discontinuance of COLA prospectively. (*Id*. ¶ 52.) BSR discontinued the payment of COLA on September 1, 2008. (*Id*. ¶ 55.) UTU disputed BSR's interpretation of the Local Agreements and demanded that BSR reinstate the payment of COLA. (*Id.* ¶ 56.) Although this dispute arose before the parties entered into the Arbitration Agreement, the question of prospective COLA was not submitted to Board 594. (*Id*. ¶ 53.)

On June 16, 2010, UTU asked the members of Board 594 for an interpretation of Award No. 1 to specify that Award No. 1 should be interpreted as having decided that BSR

was not authorized to discontinue the payment of COLA prospectively. (*Id*. ¶ 62.) The Arbitration Agreement included a provision stating, "Any difference arising as to the meaning or the application of the provisions of [Board 594's] award will be referred to the Board for a ruling." (Doc. 6-1 at 2.) Board 594 refrained from taking any action because BSR's petition for review of Award No. 1 was still pending before the Northern District of Alabama. (Doc. 6 ¶ 62.)

After the Northern District of Alabama denied BSR's petition to impeach Award No. 1, Zamperini engaged in a series of *ex parte* communications in the form of email messages with Quinn, UTU's appointed arbitrator, and other UTU representatives. (*Id*. ¶ 64.) These *ex parte* communications began in early September 2010 and continued for more than two weeks. (*Id*.) In these emails, UTU again requested an interpretation from Board 594 of Award No. 1 regarding the payment of COLA prospectively. (*Id*. ¶ 66.) Zamperini responded and asked UTU for its reasons regarding why Board 594 retained jurisdiction to issue an interpretation. (*Id*. ¶ 67.) UTU responded and supported its position with legal arguments. (*Id*. ¶ 68.) On or about September 15, 2010, UTU transmitted a proposed interpretation of Award No. 1 to Quinn. (*Id*. ¶ 71.) Zamperini became persuaded by UTU's legal arguments and issued a proposed interpretation of Award No. 1 without soliciting arguments from BSR. (*Id*. ¶¶ 72-73.) Zamperini's proposed interpretation adopted UTU's position that Award No. 1 addressed the issue of prospective COLA. (*Id*. ¶ 75.) A copy of the proposed interpretation was emailed to Cassidy, BSR's appointed arbitrator, on

September 25, 2010. (*Id.* ¶ 73.) The email included copies of some of Zamperini's *ex parte* communications with UTU representatives. (*Id.*) BSR was unaware of the *ex parte* communications between Zamperini and UTU prior to September 25, 2010. (*Id*. ¶ 65.)

On October 4, 2010, BSR mailed a letter to Zamperini demanding her recusal from Board 594 and ordering that she declare the "draft" interpretation of Award No. 1 as having no force or effect. (*Id*. ¶ 85.) BSR repeated these demands in subsequent letters dated August 16, 2011 and November 9, 2011. (*Id.* ¶ 86.) Zamperini did not resign from Board 594. (*Id.* ¶ 87.)

On November 3, 2011, UTU resubmitted its request that Board 594 issue a clarification of Award No. 1. (*Id.* ¶ 92.) Zamperini and Quinn rendered an Interpretation of Award No. 1 on November 21, 2011, finding that BSR's UTU-represented employees were entitled to future payments of COLA. (*Id.* ¶ 94.) BSR received a copy of the interpretation on November 28, 2011. (*Id.*) The interpretation was not signed by Cassidy.

    **C.**    **This Litigation**

UTU commenced this litigation on December 7, 2011 seeking to enforce the Interpretation of Award No. 1. (*See* doc. 1.) BSR filed a Counterclaim, (doc. 6), against UTU and Zamperini requesting, in part, that the Arbitration Agreement be declared invalid and unenforceable as of September 2010 based on the *ex parte* communications between Zamperini and UTU representatives, which compromised Zamperini's neutrality. BSR claims that the Arbitration Agreement is invalid and unenforceable on grounds of frustration

of purpose (Counts Two and Three), impracticability (Count Four), breach of contract (Count Five), breach of the covenant of good faith and fair dealing (Count Six), and the deprivation of BSR's statutory right to a full and fair hearing (Count Seven). (*Id*. ¶¶ 107-53.) UTU seeks to have these claims dismissed. (Doc. 18.)

### III. DISCUSSION

Congress enacted the Railway Labor Act "to promote stability in labor-management relations by providing a comprehensive framework for resolving labor disputes." *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 252 (1994) (citing *Atchison, Topeka & Santa Fe Ry. Co. v. Buell*, 480 U.S. 557, 562 (1987)); *see also* 45 U.S.C. § 151a; *Bhd. of Ry. & S. S. Clerks, Freight Handlers, Express & Station Employees. v. Ass'n for Benefit of Non-Contract Employees*, 380 U.S. 650, 658 (1965) ("The major objective of the Railway Labor Act . . . was the avoidance of industrial strife, by conference between the authorized representatives of employer and employee." (quotations omitted)). "[N]ational policy favors the final settlement of labor disputes outside of the judicial process." *Ballew v. Cont'l Airlines, Inc.*, 668 F.3d 777, 783 (5th Cir. 2012) (citing *Air Line Pilots Ass'n, Int'l v. E. Air Lines, Inc.*, 632 F.2d 1321, 1323 (5th Cir. 1980)).

To effectuate these purposes, the RLA establishes comprehesinve remedial procedures for resolving two classes of controversies arising between carriers and collective bargaining agents - "minor" disputes and "major" disputes. *See Hawaiian Airlines*, 512 U.S. at 252; 45 U.S.C. § 151a. Minor disputes, which arise "out of grievances or out of the interpretation

8

or application of agreements covering rates of pay, rules, or working conditions," 45 U.S.C. § 151a, are "subject to compulsory and binding arbitration before the National Railroad Adjustment Board, . . . or before an adjustment board established by the employer and the unions representing the employees." *Consol. Rail Corp. v. Ry. Labor Executives' Ass'n*, 491 U.S. 299, 303 (1989) (citing 45 U.S.C. § 153 Second). Major disputes are those involving "the formation or change of collective bargaining agreements covering rates of pay, rules, or working conditions." *Atchison,* 480 U.S. at 563 (internal quotations and citation omitted). Unlike minor disputes, major disputes are not subject to compulsory arbitration. *See* 45 U.S.C. §§ 155, 157. The United States Supreme Court summarized the RLA's detailed procedural framework for resolving major disputes:

> A party desiring to effect a change of rates of pay, rules, or working conditions must give advance written notice. [45 U.S.C. § 156]. The parties must confer, [45 U.S.C. § 152 Second], and if conference fails to resolve the dispute, either or both may invoke the services of the National Mediation Board, which may also proffer its services sua sponte if it finds a labor emergency to exist. [45 U.S.C. § 155 First]. If mediation fails, the Board must endeavor to induce the parties to submit the controversy to binding arbitration, which can take place, however, only if both consent. [45 U.S.C. §§ 155 First, 157].

*Bhd. of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 378 (1969). Thus, assuming a major dispute cannot be resolved through negotiation or mediation, the parties are free to submit to binding arbitration under Section 7 of the RLA. *See* 45 U.S.C. §§ 155 First, 157 Second. Alternatively, the parties can refuse Section 7 arbitration without penalty and attempt to resolve their differences through self-help. *Elgin, J. & E. Ry. Co. v. Burley*, 325 U.S. 711, 725 (1945) (recognizing that the compulsory procedures for resolving major

disputes "go only to insure that those procedures are exhausted before resort can be had to self-help. No authority is empowered to decide the dispute and no such power is intended, unless the parties themselves agree to arbitration."); *see* 45 U.S.C. § 157 Second. If the parties voluntarily elect to arbitrate a major dispute under Section 7, the RLA requires that the parties enter into an arbitration agreement in accordance with the statutory mandates of Section 8. *See* 45 U.S.C. § 158.

Judicial review of an arbitration award rendered pursuant to the RLA is exceedingly narrow. *See* 45 U.S.C. § 159. Section 9, the section governing the method and scope of judicial review of Section 7 arbitration awards, provides that "[a]n award acknowledged and filed as herein provided ***shall be conclusive*** on the parties as to the merits and facts of the controversy submitted to arbitration, . . . unless, within ten days after the filing of the award, a petition to impeach the award, on the grounds hereinafter set forth, [is filed] . . . ." 45 U.S.C. § 159 Second. District courts may only entertain petitions to impeach on three limited grounds:

> (a) . . . the award plainly does not conform to the substantive requirements laid down by this chapter for such awards, or that the proceedings were not substantially in conformity with this chapter;
>
> (b) . . . the award does not conform, nor confine itself, to the stipulations of the agreement to arbitrate; or
>
> (c) . . . a member of the board of arbitration rendering the award was guilty of fraud or corruption; or that a party to the arbitration practiced fraud or corruption which fraud or corruption affected the result of the arbitration.

45 U.S.C. § 159 Third. Interpretations of awards are subject to judicial review on the same grounds. *See* 45 U.S.C. § 158(m). Section 9 also instructs courts to construe arbitration awards liberally, "with a view to favoring [their] validity." *Id*. In light of this statutory language, it is of little surprise that judicial review under the RLA has been coined as "among the narrowest known in the law." *Union Pac. R.R. Co. v. Sheehan*, 439 U.S. 89, 91 (1978) (using this language to describe the similar impeachment grounds under Section 3 of the RLA, 45 U.S.C. § 153); *Dalfort Aerospace, Inc. v. Airline Div. of Int'l Bhd. of Teamsters*, No. 301CV006-X, 2001 WL 640790, *2 (N.D. Tex. June 7, 2001).

BSR and UTU agreed to arbitrate their dispute regarding previously paid COLA under the provisions of Section 7. (Doc. 6 ¶¶ 41-42.) The Arbitration Agreement, which created Board 594, complied with the statutory mandates of Section 8. (*See* doc. 6-1.) Accordingly, the statutory framework explained above is applicable here.

UTU moves to dismiss Counts Two through Seven of BSR's Counterclaim pursuant to Fed. R. Civ. P. 12(b)(6), arguing that such claims are impermissible collateral attacks on Board 594's Interpretation of Award No. 1. (*See generally* doc. 18.) UTU contends that the "mandatory, exclusive and comprehensive method" for reviewing Section 7 arbitration awards is Section 9, and that Counts Two through Seven are thinly-veiled attempts to circumvent Section 9's impeachment standard. (*Id*. at 10.) UTU maintains that Counts Two through Seven are barred and subsumed by Section 9, and, therefore, should be dismissed for failure to state a claim upon which relief can be granted.

11

BSR insists that Counts Two through Seven are not disguised attempts to vacate Board 594's Interpretation of Award No. 1. BSR argues that "[a]rbitration pursuant to [Section 7] is strictly voluntary and wholly dependent on the existence of a valid agreement to arbitrate," and because a Section 7 arbitration agreement is a contract, "it is subject to challenge, and potentially to a finding that the agreement is invalid and unenforceable under generally applicable contract principles, just like any other contract." (Doc. 27 at 25-26.) BSR maintains that Section 9 does not dispense with the preliminary question of whether a valid arbitration agreement exists, and, therefore, challenges to the underlying agreement to arbitrate are permissible and not precluded by the RLA.

### A.   Counts Two through Six - Common Law Contract Defenses

The court agrees with BSR to the extent that Section 7 arbitration is predicated upon the existence of a binding agreement to arbitrate. "The RLA does not dispense of the preliminary question of [substantive] arbitrability." *In re Cont'l Airlines, Inc.*, 484 F.3d 173, 183 (3d Cir. 2007); *see E. Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 861 F.2d 1546 (11th Cir. 1988) (deciding whether a collective bargaining agreement was enforceable before deciding whether the parties were subject to compulsory arbitration under Section 3 of the RLA). Whether a valid arbitration agreement exists is a question of substantive arbitrability, and questions of substantive arbitrability must be resolved by the courts. *In re Cont'l Airlines, Inc.*, 484 F.3d at 182 (citing *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475

U.S. 643, 648 (1986)).  The question whether a valid arbitration agreement exists generally hinges on whether the agreement is valid and enforceable under contract principles.

BSR challenges the validity and enforceability of an arbitration agreement created pursuant to Section 8 of the RLA – a contract that is a creature of statute.  In Counts Two through Six, BSR claims that the Arbitration Agreement became invalid and unenforceable prior to Board 594's Interpretation of Award No. 1 under common law contract principles when Zamperini and UTU representatives engaged in *ex parte* communications.  (*See* doc. 6 ¶¶ 107-43.)  The court disagrees.  The court concludes that once parties agree to arbitrate a major dispute under the provisions of Section 7 by entering into an arbitration agreement in compliance with the statutory requirements of Section 8, the parties are barred from subsequently invalidating that agreement based on common law contract principles.

As noted above, major disputes initially undergo a prolonged series of negotiation and mediation under the supervision of the National Mediation Board ("NMB").  If the parties are unable to successfully resolve their dispute through these mechanisms, the NMB must attempt to induce the parties to resolve their dispute through arbitration under the provisions of Section 7.  45 U.S.C. § 155 First (b).  The parties are not required to accept the NMB's proffer of arbitration, and the RLA imposes no penalty for refusing Section 7 arbitration.  45 U.S.C. § 157 Second.   If the parties accept the NMB's proffer, however, the parties *must* enter into an arbitration agreement in accordance with the statutory mandates of Section 8. *See* 45 U.S.C. § 158.  Section 8 provides, in pertinent part:

> The agreement to arbitrate--
>
> (a) Shall be in writing;
>
> (b) Shall stipulate that the arbitration is had under the provisions of [the RLA];
>
> . . . .
>
> (d) Shall *be signed* by the duly accredited representatives of the carrier or carriers and the employees, parties respectively to the agreement to arbitrate, and shall *be acknowledged* by said parties before a notary public, the clerk of a district court or court of appeals of the United States, or before a member of the Mediation Board, and, when so acknowledged, shall be filed in the office of the Mediation Board;
>
> (e) Shall state specifically the questions to be submitted to the said board for decision; and that, in its award or awards, the said board shall confine itself strictly to decisions as to the questions so specifically submitted to it;
>
> . . . .
>
> (g) Shall stipulate that the signatures of a majority of said board of arbitration affixed to their award shall be competent to constitute a valid and binding award;
>
> . . . .
>
> (m) Shall provide that any difference arising as to the meaning, or the application of the provisions, of an award made by a board of arbitration shall be referred back for a ruling to the same board[.]

*Id*. (emphasis added). Section 8 further provides, "The said agreement to arbitrate, when properly signed and acknowledged as herein provided, ***shall not be revoked*** by a party to such agreement: *Provided, however*, That such agreement to arbitrate may at any time be revoked and canceled by the written agreement of both parties." *Id*. (emphasis added).

14

When considering the mandatory requirements of Section 8, the court concludes that Congress intended for Section 7 arbitration agreements to be valid, irrevocable, and enforceable, and immune from attacks based on common law contract principles once formed in conformity with Section 8. The most compelling statutory language supporting the court's conclusion is that Section 7 arbitration agreements "shall not be *revoked* by [either] party" once properly signed and acknowledged. 45 U.S.C. § 158. Congress's use of the term "revoked" is significant for two reasons. First, although Black's Law Dictionary does not define the term "revoke," it defines "revocation" as "[a]n annulment, cancellation, or reversal." BLACK'S LAW DICTIONARY 1435 (9th ed. 2009). Thus, the term "revoke" means to annul, cancel, or reverse. Applying this definition to Section 8, the court finds that Congress manifested an intent for Section 7 arbitration agreements to be binding and immune from unilateral nullification or invalidation once properly signed and acknowledged by the parties. Second, Congress's use of the term "revoke" in Section 8 carries particular significance when compared to commercial arbitration agreements under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq*. Congress explicitly provided that arbitration agreements covered by the FAA are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the *revocation* of any contract." 9 U.S.C. § 2 (emphasis added). *Compare* 9 U.S.C. § 2 *with* 45 U.S.C. § 158. *See AT&T Mobility LLC v. Concepcion*, ___ U.S___, 131 S. Ct. 1740, 1748 (2011) (noting that the FAA "*preserves* generally applicable contract defenses"). Thus, arbitration agreements covered by the FAA

are subject to unilateral invalidation and nonenforcement when the agreements are *revocable* at law or in equity. The fact that the FAA provides an avenue for invalidating arbitration agreements and the RLA does not indicates that Congress intended for Section 7 arbitration agreements to be valid and enforceable upon compliance with Section 8.

A further comparison between the RLA and FAA indicates that Congress contemplated that compliance with Section 8 would ensure the validity and enforceability of Section 7 arbitration agreements. Arbitration agreements under the FAA are the product of private negotiations between the parties. Unlike Section 8 of the RLA, the FAA provides no procedure for entering into arbitration agreements covered by its provisions; nor does the FAA set forth the exact terms to be included in its arbitration agreements. Without any statutory oversight, Congress clearly foresaw circumstances where arbitration agreements under the FAA would be invalid and unenforceable as evidenced by explicitly making those agreements "*valid*, *irrevocable*, and *enforceable*, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2 (emphasis added). The RLA contains no language explicitly making Section 7 arbitration agreements "valid" and "enforceable," and Congress likely found such language unnecessary because compliance with Section 8's requirements would resolve any concerns regarding  validity or enforceability of the agreements.[4]

---

[4] It is difficult to conceive of a circumstance where an arbitration agreement in compliance with Section 8 would be invalid based on contract principles.  This is especially true when the parties to Section 7 arbitration are carriers and collective bargaining agents, both sophisticated parties well-versed in labor law.  *See* 45 U.S.C. § 157 Second.

Voluntary arbitration under Section 7 is the RLA's last procedural safeguard before parties resort to self-help. These agreements are designed to prevent disruptions to interstate commerce. Binding parties to Section 7 arbitration after they voluntarily agree to do so pursuant to Section 8's statutory commands best effectuates this scheme. To hold otherwise allows parties to circumvent their duty to arbitrate under properly signed and acknowledged Section 7 arbitration agreements and engage in the very conduct the RLA was designed to prevent.

The court's holding does not undermine the axiomatic rule of law that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960). Indeed, parties cannot be compelled to Section 7 arbitration absent an arbitration agreement in compliance with Section 8. What the court holds is that, once properly signed and acknowledged according to the RLA's statutory mandates, parties cannot subsequently invalidate a Section 7 arbitration agreement based on common law contract principles.

Here, there is no dispute BSR and UTU properly signed and acknowledged the Arbitration Agreement in conformity with Section 8. Accordingly, BSR is precluded from unilaterally invalidating the Arbitration Agreement based on common law contract principles. Therefore, UTU's Motion to Dismiss Counts Two through Six is due to be granted, and Counts Two through Six will be dismissed.

**Counts Seven - Denial of BSR's Right to a Full and Fair Hearing**

Count Seven requests that the Arbitration Agreement be declared invalid and unenforceable because UTU's *ex parte* communications with Zamperini constituted an RLA violation by depriving BSR of its statutory right to a full and fair hearing. (Doc. 6 ¶¶ 144-153.); *see* 45 U.S.C. § 157 Third (b). BSR claims that UTU "was obligated by the RLA not to undertake actions that would deprive BSR of its right to a full and fair hearing of its case before Board 594," and violated this obligation when it engaged in *ex parte* communications with Zamperini.

The same analysis applicable to Counts Two through Six is applicable here. BSR and UTU properly signed and acknowledged the Arbitration Agreement, which means its cannot be unilaterally invalidated by either party. And, even assuming BSR could invalidate the Arbitration Agreement, Section 7 imposes an obligation on the parties to provide "a full and fair hearing." Section 7 places that obligation upon the arbitration board – "[t]he board of arbitration shall . . . make all necessary rules for conducting its hearings: *Provided, however*, That the **board of arbitration** shall be bound to give the parties to the controversy a full and fair hearing." 45 U.S.C. § 157 Third (b) (emphasis added). Accordingly, BSR cannot invalidate the Arbitration Agreement based on UTU's alleged breach of duty under Section 7 because no such duty existed.[5]

---

[5]Of course, parties to Section 7 arbitration should not engage in misconduct that may jeopardize the fairness of the arbitration proceedings. If one party's misconduct ultimately deprives another party of its right to a full and fair hearing or amounts to "fraud or corruption," any award rendered in its favor may be subject to impeachment under the enumerated grounds set

## IV.  CONCLUSION

For the foregoing reasons, UTU's Motion to Dismiss, (doc. 18), is due to be granted. An Order in accordance with this Memorandum Opinion will be entered contemporaneously herewith.

**DONE**, this 28th day of September, 2012.

*Sharon Lovelace Blackburn*
SHARON  LOVELACE  BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE

---

forth in Section 9.  *See* 45 U.S.C. § 159.