FILED
2014 Mar-31  PM 01:12
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| UNITED TRANSPORTATION UNION, ) | |
| ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| BIRMINGHAM SOUTHERN ) | |
| RAILROAD COMPANY; TRANSTAR, ) | |
| INC., ) | |
| ) | CASE NO. 2:11-CV-4128-SLB |
| Defendants. ) | |
| ) | |
| ) | |
| BIRMINGHAM SOUTHERN ) | |
| RAILROAD COMPANY, ) | |
| ) | |
| Counterclaim plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| UNITED TRANSPORTATION ) | |
| UNION; CAROL J. ZAMPERINI, ) | |
| ) | |
| Counterclaim defendants. ) | |

**MEMORANDUM OPINION**

This case is currently before the court on Motions for Summary Judgment filed by

defendant Transtar, Inc., and defendant/counter claimant Birmingham Southern Railroad

Company [BSR], (doc. 45),[1] plaintiff/counter defendant United Transportation Union, (doc.

_____

[1]  Reference to a document number, ["Doc. ___"], refers to the number assigned to
each document as it is filed in the court's record.

51), and counter defendant Carol J. Zamperini, (doc. 48).  Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that Zamperini's Motion for Summary Judgment, (doc. 48), is due to be granted, UTU's Motion for Summary Judgment, (doc. 51), is due to be granted, and Transtar and BSR's Motion for Summary Judgment, (doc. 45), is due to be denied.

## I.  SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Once the moving party has met its burden, the non-moving party must go beyond the pleadings and show that there is a genuine issue of fact for trial.  *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986).   A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

(A)  citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B)  showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1); *see also Clark*, 929 F.2d at 608 ("it is never enough simply to state that the non-moving party cannot meet its burden at trial").

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.  "[C]ourts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'"  *Scott v. Harris*, 550 U.S. 372, 378 (2007)(quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)(per curiam)).  Nevertheless, the non-moving party "need not be given the benefit of every inference but only of every reasonable inference." *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999)(citing *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988)); *see also Scott*, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

"The applicable Rule 56 standard is not affected by the filing of cross-motions for summary judgment."  *Godard v. Alabama Pilot, Inc.*, 485 F. Supp. 2d 1284, 1291 (S.D. Ala. 2007)(citing *Gerling Global Reinsurance Corp. of America v. Gallagher*, 267 F.3d 1228, 1233 (11th Cir. 2001)).  "Where, as here, the parties file cross-motions for summary

judgment, a court 'must consider each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law.'" *Bio-Medical Applications of Georgia, Inc. v. City of Dalton*, 685 F. Supp. 2d 1321, 1327 (N.D. Ga. 2009) (quoting *Rossingnol v. Voorhaar,* 316 F.3d 516, 523 (4th Cir. 2003)). "Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (internal quotations).

## II. ZAMPERINI'S MOTION FOR SUMMARY JUDGMENT

Defendant/counter claimant Birmingham Southern Railroad Company [BSR] has brought a single claim against counter defendant Zamperini "for an Order requiring the submission of Board 594's purported November 21, 2011, interpretation and related 'papers and proceedings' to the Clerk of this Court in accordance with 45 U.S.C. §157 Third (f)." (Doc. 6 at 40.)  Board 594 had three members, including Zamperini, its Chair.

Section 157 Third (f) states:

> The ***board of arbitration*** shall furnish a certified copy of its award to the respective parties to the controversy, and shall transmit the original, together with the papers and proceedings and a transcript of the evidence taken at the hearings, ***certified under the hands of at least a majority of the arbitrators***, to the clerk of the district court of the United States for the district wherein the controversy arose or the arbitration is entered into, to be filed in said clerk's office as hereinafter provided.  The said board shall also furnish a certified copy of its award, and the papers and proceedings, including testimony relating thereto, to the Mediation Board to be filed in its office; and in addition a certified copy of its award shall be filed in the office of the

4

> Interstate Commerce Commission:  Provided, however, That such award shall
> not be construed to diminish or extinguish any of the powers or duties of the
> Interstate Commerce Commission, under subtitle IV of Title 49.

45 U.S.C. § 157 Third (f) (emphasis added).  This section does provide BSR with a right to compel certification from Zamperini alone.  She does not constitute Board 594 and she alone is certainly not a majority for purposes of certifying the award and the papers and proceedings.

Therefore, Zamperini's Motion for Summary Judgment, (doc. 48), will be granted and Count One of BSR's Counterclaim will be dismissed.

The court notes that its record contains authenticated copies of the Interpretation at issue, as well as copies of emails and other documents that Zamperini has testified she and the other members of Board 594 received before Board 594 rendered its Interpretation. Although BSR has argued that it cannot be assured that all relevant documents have been produced, the court finds that only BSR's speculation supports this position.  The court is satisfied, based on consideration of the entire record, that all relevant papers and proceedings surrounding Board 594's Interpretation have been filed with the court.

### III.  UTU'S MOTION FOR SUMMARY JUDGMENT

### A.      STATEMENT OF FACTS

The facts set forth below have been drawn from the court's record evidence construed in the light most favorable to BSR, the non-moving party.

### 1. General Background

BSR was a "carrier" as defined in the Railway Labor Act ("RLA"), 45 U.S.C. § 151 First, until it terminated operations on January 31, 2012.  (Doc. 1 ¶ 5; doc. 6 ¶ 5, Answer; doc. 52-1 at 6.)  Plaintiff/counterclaim defendant United Transportation Union [UTU] is a labor organization and the duly authorized "representative" within the meaning of the RLA, 45 U.S.C. § 151 Sixth, of the four "crafts and classes" of employees employed by BSR.  (Doc. 1 ¶ 4; doc. 6 ¶ 4, Answer; doc. 52-1 at 6.)

In the railroad industry, collective bargaining can occur either at the national level between multiple railroads and a union or at the local level between one railroad and a union.  (Doc. 6 ¶ 34, Countercl.; doc. 20 ¶ 34; doc. 52-1 at 6.)  Many of the nation's largest railroads choose to negotiate their labor agreements with UTU nationally through a single negotiating representative.  (Doc. 6 ¶ 34, Countercl.; doc. 20 ¶ 34; doc. 52-1 at 6.)  Other railroads, like BSR, customarily engage in local collective bargaining with UTU, entering into individualized labor agreements commonly referred to as "local agreements."  (Doc. 6 ¶ 34, Countercl.; doc. 20 ¶ 34; doc. 52-1 at 6.)

### 2. 2004 Local Agreements and National Agreement

UTU and BSR entered into four local collective bargaining agreements [the Local Agreements] between July 30, 2004 and April 7, 2005 – one for each craft and class of BSR employee represented by UTU – governing rates of pay, rules, and working conditions.  Relevant here, the Local Agreements provided for the payment of specified general wage

increases [GWI] and cost-of-living allowances [COLA] but stated that COLA payable under the Local Agreements "will be disposed of in the manner provided in the next national agreement after 2004." (Doc. 47-7 ¶ 3.) The "next national agreement," as referenced in the COLA provisions of the Local Agreements, became effective on July 1, 2008. (Doc. 6 ¶ 37, Countercl.; doc. 20 ¶ 37; doc. 52-1 at 7.) The 2008 National Agreement provided that "[a]ll cost-of-living allowance payments made under that 2002 [National] Agreement to employees for periods on and after July 1, 2005[,] shall be recovered from any retroactive wage increase payments made under Article 1 of this Agreement." (Doc. 47-4 at 11, 77, 98-99.)

BSR interpreted this provision of the National Agreement as entitling national carriers to recover certain previously paid COLA from its UTU-represented employees, and because the parties agreed in the 2004 Local Agreements that COLA paid thereunder "will be disposed of in the manner provided in the next national agreement," BSR maintained that it too was entitled to reclaim certain previously paid COLA from its UTU-represented employees. (Doc. 6 ¶ 38, Countercl.; doc. 20 ¶ 38; doc. 47-7 ¶ 4; doc. 52-1 at 11.) BSR proposed a repayment scheme whereby BSR would deduct $45.00 from each employee's semimonthly paychecks until the requisite amount was repaid. (Doc. 6 ¶ 38, Countercl.; doc. 20 ¶ 38; doc. 47-7 ¶¶ 4-5.) Predictably, UTU rejected BSR's proposal.

### 3. Award No. 1

BSR and UTU submitted the controversy to binding arbitration under 45 U.S.C. § 157 of the RLA. The Arbitration Agreement created a tripartite arbitration panel designated as

Arbitration Board 594 ("the Board" or "Board 594"), consisting of Francis X. Quinn ("Quinn") as UTU's party-appointed member, Joseph A. Cassidy ("Cassidy") as BSR's party-appointed member, and counterclaim defendant Carol J. Zamperini ("Zamperini") as the neutral chairwoman.  (Doc. 47-7 at 4.)  These were the same individuals who served on another arbitration board created by BSR and UTU in 2007, Arbitration Board 591 ("Board 591"), to resolve an impasse over healthcare cost-sharing provisions contained in the 2004 Agreements.  The parties entered into an agreement ("the 2007 Agreement") implementing a new employee healthcare cost-sharing scheme, which Board 591 adopted and incorporated into its award ("Award 591").  The 2007 Agreement contained provisions relating to the payment of COLA.

Board 594 rendered its award ("Award No. 1" or "the Award") on November 28, 2008, with Zamperini and Quinn comprising the majority and Cassidy in dissent.[2]   The Board framed the question at issue as, "Does the Agreement between the Birmingham Southern Railroad (Carrier) and the United Transportation Union (Organization) provide the Carrier with the right to re-coop [sic] the Cost-of-Living-Adjustments paid to the employees after 2004?"  (Doc. 52-1 at 44.)  The Board answered that question in favor of UTU and sustained UTU's position that the language of the Local Agreements providing that COLA

---

[2]A unanimous decision was not required. Pursuant to the parties' Arbitration Agreement, which is governed by the RLA, "[t]he Board's award will constitute a valid and binding award provided a majority of the members of the Board have affixed their signatures to the award."  (Doc. 52-1 at 41.)

"will be disposed of in the manner provided in the next national agreement after 2004" had

been superseded by the COLA provisions of the 2007 Agreement.  The Board explained that:

> When we contrast the language [of the 2007 Agreement] with the language of the [Local Agreements], we find the language of the [Local Agreements] [were] modified to exclude the following language:
>
> ARTICLE III - COST-OF-LIVING PAYMENTS
>
> Part B - Cost-of-Living Allowance and Adjustments thereto after July 1, 2006.
>
> A cost-of-living allowance will be payable in the manner set forth in and subject to the provisions of Article III, Part B of the National Agreement, as amended by Section 3 of the Supplemental Agreement dated November 6, 2003 (hereinafter referred to as the Supplemental Agreement), for the period from March 1, 2006 through August 31, 2007, preserving and continuing the parties' fourteen month lag with respect to the effective dates of future cost-of-living adjustments.  The Carrier's obligation to pay a cost-of-living-allowance will cease after August 31, 2007, at which time this provision will be eliminated.
>
> The cost-of-living allowance payable under this part will be disposed of in the manner provided in the next national agreement after 2004, consistent with Side Letter No. 4 to this Agreement, regardless of when that agreement is reached.
>
> Instead, the language implemented by [the 2007 Agreement] established that the three COLA payments would be rolled into the basic rates of pay on specific dates without regard to the National Agreement's handling of the COLA payments.

(Doc. 47-4 at 108-09.)  The Board went on to issue the following directive: "The Board finds

in favor of the Organization and orders that no COLA payments are to be [recouped] or

withheld from the paychecks of the four UTU represented groups.  In the event any payments

have been withheld, they are to be reimbursed to the employees within thirty (30) days."  (*Id.*

at 109.)

### 4. BSR Eliminates COLA

In addition to construing the 2008 National Agreement as entitling it to recoup previously paid COLA, BSR construed the 2008 National Agreement as entitling it to discontinue COLA payments.  (Doc. 6 ¶ 52, Countercl.; doc. 20 ¶ 52.)   Relying on the language of the 2004 Local Agreements that COLA payable thereunder "will be disposed of" in accordance with the next national agreement, BSR took the position that it was similarly entitled to eliminate COLA payments.  (Doc. 6 ¶ 52, Countercl.; doc. 20 ¶ 52.)   BSR discontinued the payment of COLA on September 1, 2008, three weeks before BSR and UTU entered into the Arbitration Agreement creating Board 594.  (Doc. 6 ¶ 55 Countercl.; doc. 20 ¶ 55; doc. 47-7 ¶ 10.)  UTU demanded that COLA be reinstated.  (Doc. 6 ¶ 56 Countercl.; doc. 20 ¶ 56.)

BSR suggested submitting the dispute over future payment of COLA to arbitration in accordance with 45 U.S.C. § 153 Second.  (Doc. 52-1 at 59-60.)  UTU refused to participate in further arbitration proceedings, arguing that the Board 594 Award unambiguously answered that question in its favor.  (*Id*. at 65-66.)  BSR disagreed "because that question was not before the Board."  (*Id*. at 59.)  BSR followed the statutory procedure for compelling UTU's participation in arbitration under § 153, *see* § 153 Second (second paragraph), resulting in the establishment of Public Law Board No. 7309 [PLB 7309] by the National Mediation Board [NMB].  The first task assigned to PLB 7309 was to determine whether it had jurisdiction to address the merits of the parties' dispute over future COLA payments.

On December 3, 2009, PLB 7309 issued a procedural award finding that "the dispute over [future] COLA payments must be referred to a merits PLB 7309 for hearing and resolution." (Doc. 52-1 at 86.)  UTU petitioned to impeach the PLB Award in the Northern District of Alabama, and the district court dismissed the petition with prejudice on August 23, 2010. (*See United Transportation Union v. Birmingham Southern Railroad Company*, 2:10-cv-00076-AKK, docs. 1, 25.)

Shortly before the establishment of PLB 7309, BSR had petitioned for review of Award No. 1 in the Northern District of Alabama.  *See Birmingham Southern Railroad Company v. United Transportation Union*, 2:09-CV-0579-RBP, doc. 1.  In part, BSR asked for a declaratory judgment that the dispute over prospective COLA was subject to exclusive resolution in § 153 Second arbitration.  The Honorable Magistrate Judge John E. Ott issued a Report and Recommendation on June 10, 2010, recommending that summary judgment be granted in favor of UTU and that the petition to impeach be denied.  (*See generally* doc. 52-1 at 5-38.)  Judge Ott recommended that BSR's request for declaratory relief be dismissed without prejudice because there was no "actual controversy" between the parties and because the question of future COLA would be resolved by PLB 7309.  The district court  adopted the Report and Recommendation on August 12, 2010 and granted UTU's motion for summary judgment.

11

### 5.    Interpretation of Award No. 1 by Board 594

On June 16, 2010, UTU International President M.B. Futhey, Jr., sent a letter to Board

594 requesting an interpretation of Award No. 1 pursuant to Paragraph Sixteenth of the

Arbitration Agreement, which provided that "[a]ny difference arising as to the meaning or

the application of the provision of the Board's award will be referred to the Board for a

ruling."  (Doc. 52-1 at 41, 90-91.)  The letter stated:

> Dear Board Members:
>
>        As you may know, [BSR] filed suit seeking to vacate the Award of
> Board 594 which found that it could not recoup COLA payments.  Attached
> is a copy of . . . [the] Report and Recommendation . . . rejecting [BSR's]
> contentions and enforcing the Award.
>
>        Unfortunately, the court, unsure of the arguments, did not reach the
> issue of whether [BSR] could stop future COLA payments.  It appears that
> the issue is in need of clarification.
>
>        Although [BSR] ignores Paragraph Sixteen of the Agreement . . . ,
> which provides that "any difference arising as to the meaning or application"
> of the Award is to be referred back to the Board, UTU is referring this matter
> back to the Board for an interpretation.

(*Id*. at 90-91.)

Zamperini testified that she had been unaware of BSR's Petition to impeach Award

No. 1, and she was unclear about what UTU was requesting of the Board 594.  (Doc. 47-1

at 44-46.)  She contacted Quinn to better understand the issues being presented by UTU, or,

in her own words, to "tell [her] what's going on."  (*Id*. at 46, 52.)  On June 21, 2010,

Zamperini recommended that Board 594 await the resolution of BSR's petition to impeach

12

the Award before taking action on UTU's interpretation request.  (Doc. 47-2 at 143.)  Quinn

and Cassidy concurred.  (*Id.*)

    After BSR's Petition was dismissed, UTU Vice President John Previsich notified

Quinn by email that the district court had rendered a final judgment denying BSR's petition

for review of Award No. 1.  (Doc. 47-2 at 146.)  Quinn forwarded the email to Zamperini.

(*Id.*) On September 14, 2010, Zamperini sent the following email to Quinn:

> I know you sent me a prospective Award on this.  However, [I] did not read it because I did not want to be influenced by my Mentor.
>
> I am attaching some language.  Admittedly, I do like your format, but I wanted to make sure I am on the right page.  I don't think I fully appreciate the issue.  Just between you and me, it seems that, regardless of the National Agreement, the language of the Local Agreement, as agreed to by the parties eliminates COLA after 2007.  It is my understanding that the dispute involves the COLA negotiated for years prior to that.  Or, am I missing something?  If the Organization is maintaining [that] the COLA payments were negotiated for years beyond that, I don't see any supporting language. I will . . . read the Award you sent after I send this.  It may clear it up for me.
>
> In addition, I have some concerns.  Does the Board have the authority to consider an ex-parte request for clarification.  And could the Court view this as exceeding our authority especially since another Board has deemed it to be an arbitrable issue and the Organization did not dispute their authority during the case before the Court?  Which, incidently did not go unnoticed by the Court.

(*Id.* at 147.)  Attached to this email was a proposed interpretation drafted by Zamperini,

which stated that the Award "sustained the position of [UTU] relative to all negotiated

COLA payments referenced in the 2007 Agreement and was not intended to apply only to

those COLA payments paid to the employees previously." (*Id.* at 148.)  Zamperini testified that she never read Quinn's proposed interpretation.

Zamperini remained uncertain whether Board 594 had authority to consider UTU's interpretation request and asked Quinn to have [UTU] provide its rationale for further action by Board 594.  (*Id.* at 172.), Quinn emailed Previsich, UTU Vice President, stating, "[W]e need to see language of 'Parag. 16'.  Can one party unilaterally ask for clarification?"  (Doc. 52-1 at 100.)  Previsich contacted UTU Associate General Counsel Kevin Brodar, and, by email dated September 15, 2010, Brodar provided Previsich and Quinn with the language of Paragraph Sixteenth of the Arbitration Agreement and his argument supporting UTU's position that Board 594 retained jurisdiction to consider [UTU's] interpretation request. (Doc. 47-2 at 149; doc. 52-2 at 4.)  Quinn forwarded Brodar's email to Zamperini.  (Doc. 47-2 at 149-50.)  On the morning of September 16, 2010, Quinn emailed Zamperini, Brodar, and Previsich asking, "Do you think that there should be a formal request to the Board (all three members & [the NMB]) for clarification?"  (Doc. 47-2 at 162.)  Brodar responded to all three recipients stating that a request for interpretation had been made, but, "If you are not comfortable with the earlier request, [UTU] could make a more formal request."  (Doc. 47-2 at 158; *see also* doc. 47-1 at 87-88.)  Apparently unaware that Brodar had responded directly to Zamperini, Quinn forwarded Brodar's response to Zamperini along with a proposed interpretation of Award No. 1 that Brodar had sent directly to Previsich and Quinn for

14

internal discussion. (Doc. 47-2 at 158-61; *see* doc. 47-1 at 88.)  Zamperini testified that she did not read Brodar's proposed interpretation.  (Doc. 47-1 at 93.)

Later that same day, September 16, 2010, Quinn sent a second email to Brodar and Previsich expressing lingering doubts about Board 594's jurisdiction to consider a unilateral interpretation request under the terms of the Arbitration Agreement.  (Doc. 52-2 at 16.) Brodar responded the following day and explained UTU's position as to why the Arbitration Agreement and the RLA authorized one party to make an interpretation request.  (*Id.* at 15-16; doc. 47-2 at 162-64.) Quinn again forwarded Brodar's response to Zamperini.  (Doc. 47-2 at 165-66.) Zamperini decided Board 594 had jurisdiction to interpret Award No. 1 after reading Brodar's response.  (Doc. 47-1 at 115-16 & 178; *see* doc. 47-2 at 172 & 179-80.)

On September 25, 2010, Zamperini sent five emails to Quinn and Cassidy. (Doc. 47-2 at 167, 172, 175 & 178.)  She also sent the emails from UTU forwarded to her by Quinn, the email she received directly from Brodar, and a draft interpretation of Award No. 1 favorable to UTU to Cassidy and Quinn. (*See* doc. 47-2 at 167-82.)[3]  Zamperini told Cassidy that she had requested that Quinn obtain UTU's rationale regarding Board 594's jurisdiction to consider UTU's unilateral interpretation request and that the September 17, 2010 email from Brodar convinced her that Board 594 had jurisdiction.  (Doc. 47-2 at 172, 180.)  She mentioned that communicating with Board 594 had been unnecessary before she had the

---

[3]Zamperini did not provide Cassidy with her communications to Quinn.  (Doc. 47-1 at 101-02 & 120-21.)

necessary information to formulate a draft position.  (*Id*. at 173.)  She also stated that her attached interpretation was only a draft.  (*Id*. at 180.)  She asked UTU and BSR to provide their respective positions, but she noted her draft interpretation was "the [gist] of what [she] believe[d] the majority in SBA 594 intended." (*Id*.)  Zamperini testified that she considered her draft interpretation as a "starting point" to facilitate discussion.  (Doc. 47-1 at 119-20.)

By letter dated October 4, 2010, counsel for BSR, Jeffery Berlin, asked Zamperini to resign from Board 594 immediately and declare her proposed interpretation of Award No. 1 to be invalid.  (Doc. 47-2 at 183-86.)  Berlin stated, "The actions that are documented in the email messages that you provided to Mr. Cassidy . . . make it impossible for you to serve as neutral arbitrator in connection with any aspect of the dispute that was presented to Board 594." (*Id*. at 185.)  The following day, Zamperini emailed Cassidy and Quinn reiterating her position that her draft interpretation was only meant to be a "starting point" for further discussion.  (Doc. 52-2 at 46.)  Cassidy responded, asking when and where Board 594 should meet to discuss the interpretation request.  (*Id*.)  Zamperini proposed either having a conference call or an in-person conference in Denver during the week of October 18, 2010. (*Id*. at 48.)

UTU asked the National Mediation Board ("NMB") to reconvene Board 594 on October 8, 2010, to which BSR filed an opposition.[4]  (Doc. 52-2 at 53-54, 90-98.)  On

_____

[4]In its letter to the NMB, BSR noted, "UTU has requested that Board 594 be reconvened pursuant to Section 7 Third (c) of the Railway Labor Act, 45 U.S.C. § 157 Third (c) . . . . For the following reasons, the NMB should decline UTU's request and should not

October 12, 2010, BSR petitioned the NMB to disqualify Zamperini from Board 594, (doc. 47-2 at 245-61; doc. 52-2 at 68-84), and Berlin sent Zamperini a second letter requesting that she stop all efforts to conduct proceedings in the name of Board 594, (doc. 52-2 at 63-64). The day before, Zamperini had emailed Cassidy and Quinn inquiring into their availability to discuss the interpretation request.  (Doc. 52-2 at 61.)  Cassidy responded on October 12, 2010, stating that he believed Board 594 was closed, had not been reopened, and communications between Zamperini and Quinn had been improper.  (*Id*. at 86.)

On October 17, 2010, Quinn sent Zamperini a proposed interpretation of the Award No. 1.  (Doc. 47-2 at 275-76.)  Zamperini responded with revisions to the language and asked him whether he was agreeable to the changes, noting that "I do not think the payments are to go beyond 2007."  (*Id*. at 279.)  Quinn responded, "You do good work!"  (*Id*.)

The NMB Director of the Office of Arbitration Services sent a letter to Brodar and Berlin on October 27, 2010, regarding UTU's request to reconvene Board 594.  The letter stated that:

> The Nation Mediation Board (NMB) has received a letter from the United Transportation Union (UTU) requesting that the NMB give formal notice of the UTU's desire to reconvene Arbitration Board No. 594.  Pursuant to Section 157 Third (c) of the Railway Labor Act, you are notified of the UTU's desire to reconvene Arbitration Board. No. 594.

(Doc. 47-2 at 285; doc. 52-2 at 105.)  Zamperini did not view this letter as NMB's decision to reconvene Board 594, noting in an email to Quinn that "[it] just notified the parties of the

_____

give notice to Board 594 pursuant to RLA § 7 Third (c)."  (Doc. 52-2 at 90.)

[UTU's] request." (Doc 47-1 at 204; doc. 47-2 at 286.)  On November 1, 2010, UTU asked

Board 594 to reconvene and render an interpretation of Award No. 1 as soon as possible.

(Doc. 47-2 at 295; doc. 52-2 at 110.)

This matter lay dormant for eight months until UTU reasserted its request for an

interpretation by letter dated July 7, 2011. (Doc. 47-2 at 325; doc. 52-2 at 140.)  BSR

responded on July 12, 2011, asserting that Board 594 was closed and that "Zamperini is

disqualified by reason of her prohibited *ex parte* communications with the union from

participating in any further action by Board 594." (Doc. 47-2 at 327; doc. 52-2 at 142.) UTU

sent another letter to the Board, asserting that BSR's positions were incorrect and reasserting

its request for an interpretation.

Zamperini emailed Cassidy and Quinn on July 18, 2011, and proposed that Board 594

hold an executive session to address the interpretation request.  (Doc. 47-2 at 330; doc. 52-2

at 147.)  Zamperini then sent a letter to UTU and BSR representatives seeking their

attendance and a mutually agreeable date for the executive session.  (Doc. 47-2 at 331; doc.

52-2 at 149.)  UTU replied with available dates, (doc. 52-2 at 151), but BSR refused to send

dates it was available on the grounds that Zamperini was disqualified and the Board was

defunct, (doc. 53 at 6.)  Cassidy informed Zamperini that BSR maintained that he had no

authority to act on its behalf based on its stance that Board 594 was defunct and he told her

that he would not participate in any further deliberations regarding Award No. 1 unless

authorized by the NMB.  (Doc. 52-2 at 153.)  Zamperini sent another letter to UTU and BSR

representatives, which again requested for BSR to provide available dates for the executive session.  (Doc. 47-2 at 342-43; doc. 53 at 9-10.)  In this letter, Zamperini acknowledged the parties' dispute regarding Board 594's jurisdiction to act on UTU's interpretation request and she informed the parties that they would be given an opportunity to address Board 594's jurisdiction during the executive session.  (Doc. 47-2 at 342-43; doc. 53 at 9-10.)  Again, BSR refused to participate and it demanded that Zamperini resign from Board 594.  (Doc. 47-2 at 347-49; doc. 53 at 12-14.)

On August 16, 2011, BSR filed a Motion for Immediate Preliminary Relief with the NMB in support of its petition for Zamperini's disqualification from Board 594.  (Doc. 53 at 16-26.)  It asked the NMB to enter an order prohibiting Zamperini from taking any action in connection with or in the name of Board 594.  (Doc. 53 at 16.)  General Counsel for the NMB denied BSR's requested relief.

### 6. Interpretation of Award No. 1

On November 21, 2011, Board 594 issued its Interpretation; it stated –

[UTU] requests the Board provide a clarification relative to the majority Award issued on about November 28, 2008.

ISSUE:

Does the agreement between [BSR and UTU] provide [BSR] with the right to [recoup] the Cost-of-Living Adjustments provided to the employees in the 2002 Agreement?

DECISION:

> After reviewing the language provided by the parties and included as part of the Award issued by Special Board of Adjustment 591, the Board [594] concluded that the Cost-of-Living Adjustments negotiated by the parties in that language were to be rolled into the basic wage rates without regard to the National Agreement's handling of the COLA payments.  The majority Board Award directed that all negotiated COLA payments paid to employees were to become a permanent part of employee wages and were not to be [recouped] by [BSR].

(Doc. 1-1.)  Quinn and Zamperini signed the Interpretation; Cassidy did not.  (*Id.*)

## B.  DISCUSSION

UTU filed a Petition to Enforce Board 594's Interpretation of Award No. 1.  (*see generally* doc. 1.)  In response, BSR filed a Counterclaim in which it asked the court "to impeach, review, and set aside" the Interpretation.  (Doc. 6 at 53.)  UTU has moved the court for a summary judgment on BSR's Counterclaim and on its Petition to Enforce.  For the reasons set forth below, the court finds that UTU's Motion for Summary Judgment, (doc. 51), will be granted in part and denied in part.

The court begins by noting that the validity of Award No. 1 was established by this court in a prior proceeding.  That finding is binding on the parties in this action.

BSR alleges that the Interpretation of Award No. 1 by Board 594 is due to be set aside because –

> 1.  "The purported November 21, 2011 interpretation plainly does not conform, nor confine itself, to the substantive requirements of the RLA, and the proceedings were not substantially in conformity with the RLA's requirements," (doc. 6 at 53);

20

2. "The purported November 21, 2011 interpretation does not conform, nor confine itself, to the stipulations of the parties' Arbitration Agreement," (*id*. at 60);

3. "The purported November 21, 2011 interpretation must be set aside because the Chairwoman of Board 594 was guilty of "fraud or corruption," and also because the interpretation is the result of "fraud or corruption" on the part of UTU, a party to the arbitration," (*id*. at 65).

BSR contends that the Interpretation is due to be set aside pursuant to 45 U.S.C. § 159 Third. This statute authorizes judicial review of awards rendered by arbitration boards created under § 157 of the RLA, such as Board 594; but, the scope of a court's review is "among the narrowest known in the law." *Union Pac. R.R. Co. v. Sheehan*, 439 U.S. 89, 91 (1978) (using this language to describe the similar impeachment grounds under 45 U.S.C. § 153); *Dalfort Aerospace, Inc. v. Airline Div. of Int'l Bhd. of Teamsters*, No. 301CV006-X, 2001 WL 640790, at *2 (N.D. Tex. June 7, 2001). Specifically, this court may impeach the Interpretation only if one of three grounds is established:

(a) That the award plainly does not conform to the substantive requirements laid down by this chapter for such awards, or that the proceedings were not substantially in conformity with [the RLA];

(b) That the award does not conform, nor confine itself, to the stipulations of the agreement to arbitrate; or

(c) That a member of the board of arbitration rendering the award was guilty of fraud or corruption; or that a party to the arbitration practiced fraud or corruption which fraud or corruption affected the result of the arbitration.

45 U.S.C. § 159 Third.

In determining whether an award should be impeached on these grounds, courts must construe the award liberally "with a view to favoring its validity."  *Id*.  "[N]o award shall be set aside for trivial irregularity or clerical error, going only to form and not to substance." *Id*.  An interpretation of a prior award, which becomes "part of and . . . ha[s] the same force and effect as [the] original award," is subject to judicial review under  § 159 Third.  45 U.S.C. § 158(m); *see Bhd. of R. R. Trainmen v. Chicago, M., St. P. & P. R. Co.*, 380 F.2d 605, 608 (D.C. Cir. 1967).

### 1.     45 U.S.C. § 159 Third (a) – Conformity with the RLA

BSR alleges that the Interpretation should be impeached pursuant to § 159 Third (a) because the Interpretation "does not conform [or] confine itself to the substantive requirements of the RLA," and because "the proceedings were not substantially in conformity with the RLA's requirements."  (Doc. 6 at 53.)  The grounds upon which BSR seeks impeachment  under § 159 Third (a) are:  (1)  "Board 594 was closed in 2008 and had no authority in 2011 to issue an interpretation or take any other action," (doc. 6 at 54); (2) "Board 594 denied BSR the 'full and fair hearing' required by the RLA," (*id*. at 56); and (3) "The purported interpretation is beyond the permissible scope of an interpretation under the RLA, because it addressed an issue that was not addressed by the Board in its original award," (*id*. at 58).

### a.  Board 594 was properly reconvened.

BSR argues that Board 594 was not properly reconvened because it was not reconvened in accordance with 45 U.S.C. § 155 Third (d).  Section § 155 Third (d) provides, in pertinent part:

> Either party to an arbitration desiring the reconvening of a board of arbitration to pass upon any controversy arising over the meaning or application of an award may so notify the Mediation Board in writing, stating in such notice the question or questions to be submitted to such reconvened Board. The Mediation Board shall thereupon promptly communicate with the members of the Board of Arbitration, or a subcommittee of such Board appointed for such purpose pursuant to a provision in the agreement to arbitrate, and arrange for the reconvening of said Board of Arbitration or subcommittee, and shall notify the respective parties to the controversy of the time and place at which the Board, or the subcommittee, will meet for hearings upon the matters in controversy to be submitted to it.

45 U.S.C. § 155 Third (d).  BSR contends that § 155 Third (d) constitutes "a specific procedure to be followed in connection with the submission of a request for an interpretation of an award rendered by an § 157 arbitration board," and, because the NMB never reconvened Board 594 in accordance with this statute, Board 594 had no authority to render the Interpretation.

The court notes that § 155 Third (d) is not the only provision of the RLA related to reconvening an arbitration board for purposes of interpreting a prior award.  Section 157 Third (c), titled "Duty to reconvene" and located within the section prescribing the rules and procedures for arbitration under § 157, provides, in relevant part:

23

> Upon notice from the Mediation Board that the parties, or either party, to an arbitration desire the reconvening of the board of arbitration . . . to pass upon any controversy over the meaning or application of their award, the board . . . shall at once reconvene.

45 U.S.C. § 157 Third (c).  Section 158(m) requires that agreements to arbitrate under § 157 "provide that any difference arising as to the meaning, or the application of the provisions, of an award made by a board of arbitration shall be referred back for a ruling to the same board."  45 U.S.C. § 158(m).  The parties included language identical to § 158(m) in the Sixteenth Paragraph of their Arbitration Agreement.  (*See* doc. 52-1 at 41-42.)

UTU contends that Board 594 was properly reconvened in accordance with the requirements in § 157 Third (c).  The court agrees.  UTU petitioned the NMB to "give formal notice to the Board of UTU's desire to reconvene the Board[] [pursuant to] 45 U.S.C. § 157 Third (c)," and, on October 27, 2010, the NMB sent a letter to the parties that stated, "***Pursuant to Section 157 Third (c)*** of the Railway Labor Act, you are notified of the UTU's desire to reconvene Arbitration Board No. 594."  (Doc. 47-2 at 285 [emphasis added].)  This letter was sufficient notice to reconvene Board 594 pursuant to the plain meaning of § 157 Third (c).  Therefore, the failure of the NMB to reconvene Board 594 in accordance with § 155 Third (d) provides no basis for impeaching the Interpretation.

**b. BSR had a full and fair hearing.**

BSR contends that the Interpretation is impeachable on the ground that it was denied

a full and fair hearing as required by the RLA.  Section 157 Third (b) governs the procedure

for arbitration conducted under the RLA; it provides:

> The board of arbitration shall organize and select its own chairman and make
> all necessary rules for conducting its hearings:  *Provided, however*, That the
> board of arbitration shall be bound to give the parties to the controversy a
> ***full and fair hearing***, which shall include [1] ***an opportunity to present
> evidence in support of their claims***, and [2] ***an opportunity to present their
> case in person, by counsel, or by other representative*** as they may
> respectively elect.

45 U.S.C. § 157 Third (b) (emphasis added).  BSR contends that the Interpretation was the

result of "secret proceedings" and ex parte communications between UTU and Zamperini

and Quinn, and, thus, it was denied a full and fair hearing.  However, the court finds BSR has

failed to present an issue of fact as to whether Board 594, Zamperini, and/or Quinn denied

it an opportunity to present evidence and/or argument before issuing the Interpretation.

As set forth in detail above, the so-called "secret proceedings" and ex parte

communications concerned preliminary discussions regarding whether Board 594 would be

reconvened for purposes of addressing UTU's request for an interpretation.  Although some

drafts of proposed Interpretations were presented to Zamperini, her testimony and her

statements in emails indicate that she did not make a final decision on the issue before

receiving BSR's evidence and arguments, which she repeatedly requested.   BSR's

speculation regarding some nefarious conduct not demonstrated by the record before this

court "does not meet [BSR's] burden of producing some defense to [UTU's] summary judgment motion. Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005)(quoting *Hedberg v. Ind. Bell Tel. Co.*, 47 F.3d 928, 931-32 (7th Cir. 1995))(emphasis in *Hedberg*).

The evidence demonstrates that Zamperini specifically solicited BSR's evidence and argument in opposition to UTU's proposed construction of Award No. 1. As set forth above, Zamperini asked BSR to attend an executive session regarding UTU's request for an interpretation and asked it for agreeable dates. (Doc. 47-2 at 331; doc. 52-2 at 149.) BSR refused to attend, asserting that Board 594 was "defunct." (Doc. 52-2 at 151.) Its representative on Board 594, Joe Cassidy, responded that he had no authority to act on BSR's behalf based on its stance that Board 594 was defunct and that he would not participate in any deliberations unless authorized by the NMB. (*Id*. at 153.) Zamperini asked again for BSR's participation and again, BSR refused, asserting its request that Zamperini withdraw from Board 594. (Doc. 47-2 at 342, 347-49; doc. 53 at 9, 12-14.) BSR tried to stop the proceedings by asking the NMB to enjoin the Interpretation proceedings and to disqualify Zamperini from further participation. (Doc. 53 at 16.) The NMB denied BSR's requested relief. (Doc. 53 at 32.) Despite the failure of its efforts to have the NMB stop the interpretation proceedings and/or to disqualify Zamperini, BSR refused to participate in the interpretation proceedings before Board 594, despite its opportunity to do so.

The court finds that no action taken by Board 594 or Quinn and/or Zamperini denied BSR a full and fair hearing.  Specifically, the court finds that BSR has not demonstrated that it was denied "an opportunity to present evidence" or "an opportunity to present [its] case in person, by counsel, or by other representative as [it] may [have] elect[ed]," *see* 45 U.S.C. § 157 Third (b) with regard to *either* the authority of Board 594 to reconvene for purposes of interpreting award No. 1 *or* its proposed interpretation of Award No. 1.

### c. The Interpretation was within the scope of Award No. 1

BSR seeks to impeach the Interpretation under § 159 Third (a) on the ground that the Interpretation went beyond the scope of Award No. 1.  Specifically, it alleged:

> 180.  Award No. 1 plainly did not address, and did not decide, and could not lawfully have decided, the separate question whether BSR's collective bargaining agreements authorized it to discontinue prospectively the payment of COLA to its employees.

> 181.  The content of the purported November 21, 2011 interpretation addresses a question that was not presented to Board 594 in the original proceedings that led to the issuance of Award No. 1.  Accordingly, the purported interpretation is not consistent with RLA requirements.

(Doc. 6 ¶¶ 180-181.)

Section 157 Third (c) provides, "No question other than, or in addition to, the questions relating to the meaning and application of the award, submitted by the party or parties in writing shall be considered by the reconvened board of arbitration . . . ." 45 U.S.C. § 157 Third (c).  Award No. 1 provided that Board 594 "concur[red]" with UTU's position regarding recoupment of COLA.  (Doc. 1-2 at 5.)  Specifically, Award No. 1 states, "[T]he

27

language implemented by Award 1, Arbitration Board 591, established that the three COLA

payments would be rolled into the basic wage rates on specific dates without regard to the

National Agreement's handling of the COLA payments." (*Id*. at 5-6.) Moreover, Board 594

"order[ed] that no COLA payments are to be [recouped] or withheld from the paychecks of

the four UTU represented groups." (*Id*. at 6.)  In the Interpretation, Board 594 stated the

same issue as it set forth in Award No. 1, and it held:

> After reviewing the language provided by the parties and included as part of
> the Award issued by Special Board of Adjustment 591, the Board concluded
> that the [COLA] negotiated by the parties in that language were to be rolled
> into the basic wage rates without regard to the National Agreement's handling
> of the COLA payments.   The majority Board Award directed that all
> negotiated COLA payments paid to employees were to become a permanent
> part of employee wages and were not to be [recouped] by [BSR].

(Doc. 1-1.)  Contrary to BSR's assertion, the Interpretation did not go beyond the scope of

Award No. 1.  Award No. 1 specifically addressed whether the parties' Agreement, attached

to Board 591's Award, allowed BSR to recoup COLA.  Board 594 held that it did not because

the parties' Agreement treated three "cost-of-living payments – on October 1, 2006, March

1, 2007, and September 1, 2007 – as "rolled into basic rates of pay." (Doc. 1-1.)  The

Interpretation discussed no new issue or evidence and, in fact, appears to be no more than a

condensed version of Award No. 1.  BSR has not shown that the Interpretation exceeded the

scope of Award No. 1 or was something other than a clarification of Board 594's prior decision.[5]

### 2.    45 U.S.C. § 159 Third (b) – the Parties' Arbitration Agreement

BSR also petitions to impeach the Interpretation because it "does not conform, nor confine itself, to the stipulations of the agreement to arbitrate" under § 159 Third (b) because the Interpretation, by addressing the issue of future COLA payments, addressed an issue never presented to Board 594 in the proceedings that led to Award No. 1.

BSR claims that the Board's jurisdiction was defined in the Fourth and Fifth Paragraphs of the Arbitration Agreement and the questions submitted to Board 594 by the parties prior to the issuance of the Award No. 1.  The Fourth Paragraph provides that the "specific questions to be submitted to the Board" were "COLA and employee cost-sharing (co-pays) questions to be framed separately by each party," and Paragraph Fifth provides that "[i]n its award, the Board will confine itself strictly to a decision as to the questions specifically submitted to it."  (Doc. 52-1 at 40.)  The parties presented their respective versions of the COLA question in their position statements submitted to Board 594 preceding the issuance of Award No. 1.  BSR framed the question to be decided as follows:

_____

[5]Although not relevant to the court's determination of the matters presently before it, the court notes that Award No. 1 changed the character of the so-called COLA payments into increases to the basic wage rates by noting that the COLA payments were "rolled into" or became part of the basic wage rate.  The rules for reducing the basic wage rates agreed to in the Local Agreements, thus, would control whether BSR could reduce a basic wage rate – whether or not the reduction was equivalent to the amount of a prior increase in the basic wage rate attributable to a COLA.

29

> Is the carrier correct that because the UTU-represented employees covered by the July 1, 2008 National Agreement had to "repay" all of the COLA they were paid after 2004 by having it offset against their retroactive wage increases, the UTU-represented employees of BS[R] have a similar obligation to repay the COLA they received under the terms of the four local wage and rules agreements because they agreed that COLA would be disposed of in the manner provided in the next national agreement after 2004?

(Doc. 47-4 at 8.)  UTU phrased the question as follows: "May the carrier recover cost of living allowances previously paid to the employees without including the corresponding wage increases set forth in the United Transportation Union National Agreement?"  (*Id*. at 66.)  Based on the parties' submissions, the Board framed the question to be decided as, "Does the Agreement between the Birmingham Southern Railroad (Carrier) and the United Transportation Union (Organization) provide the Carrier with the right to [recoup] the Cost-of-Living-Adjustments paid to the employees after 2004?"  BSR contends that the Arbitration Agreement, which strictly confined Board 594 to a decision as to the specific questions submitted by the parties, and the questions as framed by the parties and the Board, which BSR interprets as relating exclusively to BSR's right to reclaim previously paid COLA, prohibited Board 594 from issuing an interpretation affecting BSR's right to eliminate COLA prospectively.

This ground for impeaching the Interpretation is foreclosed by the fact that, regardless of whether the issue was before it, Board 594's Award No. 1 decided that the three COLA payments agreed to as part of the decision of Board 591 became part of the basic wage rate and the Interpretation merely clarified Award No. 1.  The Interpretation did not decide or

address any new issue.  Although BSR contends Award No. 1 exceeded the scope of the

parties' Arbitration Agreement, the Interpretation did not go beyond the scope of Award No.

1.

The Sixteenth Paragraph of the parties' Arbitration Agreement authorizes Board 594

to interpret Award No. 1 should any disagreement as to its meaning or application arise.

(Doc. 52-1 at 41-42.)  The Sixteenth Paragraph, which is required by 45 U.S.C. § 158(m),

operates in tandem with § 157 Third (c).  Together these provisions make apparent that

Board 594's authority with respect to an interpretation is "limited to an interpretation or a

construction of its original award."  Board 594 could not reconsider the merits of Award No.

1 or modify it in any way.  *Mid-Continent Airlines*, 83 F. Supp. at 978; *Order of R.R.

Telegraphers*, 181 F.2d at 117 ("The Act confines them, generally, to the stipulations of the

agreement to arbitrate and, as to interpretations, to the meaning and application of the

award."); *see also Bhd. of Locomotive Engineers & Trainmen Gen. Comm. of Adjustment

CSX Transp. N. Lines v. CSX Transp., Inc.*, 522 F.3d 1190, 1199 (11th Cir. 2008) (finding

that § 153(m), which permits adjustment boards to interpret their prior awards, "provides

arbitrators the power to interpret final awards, [but] it does not give them the power to alter

or modify them whatsoever"); *Transp.-Commc'ns Int'l Union v. CSX Transp., Inc.*, 92 C

5737, 1993 WL 313584, at *3 (N.D. Ill. Aug. 17, 1993) ("[T]he Board only possesses

authority to interpret and not to reconsider its decisions.") *aff'd sub nom. Transp. Commc'ns

Int'l Union v. CSX Transp., Inc.*, 30 F.3d 903 (7th Cir. 1994).  As explained earlier, Board

594 acted within its authority established in the parties' Arbitration Agreement to interpret the arguably ambiguous provision of Award No. 1, which ordered that BSR could neither recoup nor withhold COLA.

BSR's continuing assertions that the question originally presented to Board 594, not the terms of Award No. 1, determined Board 594's authority under the parties' Arbitration Agreement as to the Interpretation are without merit.  Section § 157 Third (c) limits the questions an arbitration board may consider during an interpretation proceeding and provides, in pertinent part, that:  "No question other than, or in addition to, the ***questions relating to the meaning or application of the award***, submitted by the party or parties in writing, shall be considered by the reconvened board of arbitration or its subcommittee."  45 U.S.C. § 157 Third (c) (emphasis added).  Thus, the RLA contemplates that an arbitration board will answer questions distinct from the questions originally submitted under the Arbitration Agreement, and those distinct questions will "relat[e] to the meaning or application of the award."  Moreover, the cases that have reviewed the enforceability of an interpretation under § 159 confined their analysis to whether the board interpreted or modified the original award. In *Order of R.R. Telegraphers*, the Second Circuit found certain interpretations within the scope of the arbitration board's jurisdiction and that the petition to impeach the interpretation was properly denied because "the answer[s] given [were] so obviously confined to interpreting the original award . . . . "  181 F.2d at 117.  The district court in *Mid-Continent Airlines* vacated an arbitration board's interpretation of a prior award because the board made

32

an "entirely new award," which was "inconsistent with any conceivable interpretation of [the] original award." 83 F. Supp. at 978.[6]

For the foregoing reasons, the court finds that BSR cannot impeach the Interpretation based on an argument that Award No. 1 went beyond the scope of the parties' Arbitration Agreement.

---

[6]As noted above, the Interpretation did not modify or alter Award No. 1. And, the record evidence precludes BSR from claiming that it did not know that the Award potentially decided the question of prospective COLA payments prior to the Interpretation. UTU informed BSR of its position that Award No. 1 rolled COLA into employees' basic wage rates prior to BSR's commencement of the 2010 impeachment proceedings. (Doc. 52-1 at 65-66.) BSR dismissed UTU's position, notwithstanding the clear and unambiguous language of Award No. 1, "because that question was not before the Board." (*Id*. at 65.) . (Doc. 52-1 at 59-60, 65-66.) However, even Cassidy, BSR's party-appointed arbitrator, realized the scope of Award No. 1 as including the basic-wage-rate issue when he stated in his dissent to Award No. 1 –

> We were not empowered to treat the issue of the basic daily wage, which is what this Board has done in Award No. 1. . . . The question at issue only dealt with COLA and whether the carrier could recoup those allowances that had been paid to the BS employees as was done in the national agreement.
>
> . . . .
>
> Because this Board was charged with answering the sole question regarding repayment of . . . COLA, the majority went far afield when they treated the matter of reconciling the basic daily rate of pay.

(Doc. 47-4 at 117.)

33

### 3.  45 U.S.C. § 159(c) – Fraud and Corruption

BSR alleges that the Interpretation should be impeached pursuant to § 159 Third (c) because it was procured by fraud and corruption on part of Zamperini and UTU.  The RLA does not define either fraud or corruption under § 159 Third (c), but the courts that have examined the type of misconduct that constitutes fraud or corruption under the RLA agree that it encompasses only "an extremely high degree of improper conduct" and requires a greater evidentiary showing than that under common law.  *Pac. & Arctic Ry. & Nav. Co. v. United Transp. Union*, 952 F.2d 1144, 1148 (9th Cir. 1991); *see United Transp. Union v. BNSF Ry. Co.*, 710 F.3d 915, 931-32 (9th Cir. 2013); *Goff v. Dakota, Minnesota & E. R.R. Corp.*, 276 F.3d 992, 996 (8th Cir. 2002).

"At common law, fraud was established if the plaintiff proved that 'the defendant made false representations of material fact, intended to induce plaintiff to act, the representations were made with knowledge of, or reckless disregard for, their falsity, and the plaintiff justifiably relied upon those false representations to [its] detriment.'" *Pac. & Arctic Ry.*, 952 F.2d at 1147 (quoting *Bulgo v. Munoz*, 853 F.2d 710, 716 (9th Cir. 1988)); *see also Wright v. AmSouth Bancorporation*, 320 F.3d 1198, 1204 (11th Cir. 2003)("[T]he elements of an Alabama fraud claim [are]:  (1) a misrepresentation, (2) of a material existing fact, (3) on which the plaintiff relied, and (4) which proximately caused injury or damage to the plaintiff.")(citations and internal quotations omitted).  Generally, the test for "fraud" under the RLA is the same as under the Federal Arbitration Act ("FAA").  *See Pac. & Arctic Ry.*,

952 F.2d at 1148.  With regard to fraud sufficient to vacate an arbitration award under the

FAA, the Eleventh Circuit has held:

> First, the movant must establish the fraud by clear and convincing evidence.
> Second, the fraud must not have been discoverable upon the exercise of due
> diligence prior to or during the arbitration.  Third, the person seeking to vacate
> the award must demonstrate that the fraud materially related to an issue in the
> arbitration.  This last element does not require the movant to establish that the
> result of the proceedings would have been different had the fraud not occurred.

*Bonar v. Dean Witter Reynolds, Inc.*, 835 F.2d 1378, 1383 (11th Cir. 1988)(internal citations

and footnotes omitted).

BSR has not established common law fraud based upon the alleged "secret

proceedings" or ex parte communications.  It contends, "The conduct of secret proceedings

by Board 594 Chairwoman Zamperini and UTU beginning not later than September 2010,

and continuing to a date unknown to BSR, while Ms. Zamperini maintained the outward

appearance of neutrality and impartiality, constitutes 'fraud and corruption' by Chairwoman

Zamperini and UTU, within the meaning of the RLA.  (Doc. 6 at 68, ¶ 216; *see also id*. ¶ 217

[stating that "[t]he *ex parte* communications between Board 594 Chairwoman Zamperini and

UTU" constitute fraud or corruption].)  However, there is no evidence that BSR relied upon

Zamperini's appearance of neutrality or impartiality or any other omission or

misrepresentation during the proceedings.  The evidence is undisputed that Zamperini

provided BSR and Cassidy, its representative on Board 594, with some, if not all,[7] of the

---

[7]As noted, *supra*, Zamperini did not provide Cassidy with her communications to
Quinn.

communications between Zamperini, Quinn, and UTU before attempting to schedule the proceedings to consider UTU's request for an interpretation.  Thereafter, BSR moved to disqualify Zamperini and bar Board 594 from taking action on UTU's request for an interpretation.  These efforts were unsuccessful.  However, when Zamperini notified BSR and UTU that Board 594 was going forward with the interpretation proceedings, she asked BSR to present provide Board 594 with its evidence and arguments, including its arguments regarding the Board's authority to act on the interpretation request.  BSR steadfastly refused to participate – repeatedly asserting its call for Zamperini's resignation or removal and its position that Board 594 was powerless to act.

BSR has submitted no evidence or argument indicating that it relied upon any misrepresentation created by the "secret proceedings" or "ex parte communications." Therefore, the court finds it cannot establish common law fraud by clear and convincing evidence.

That leaves "corruption" as a basis for impeaching the Interpretation pursuant to 45 U.S.C. § 159 Third (c).  The RLA does not define "corruption."  However, Black's Law Dictionary defines "corruption" as :

> 1.  Depravity, perversion, or taint; an impairment of integrity, virtue, or moral principle; esp., the impairment of a public official's duties by bribery. . . .  2.  The act of doing something with an intent to give some advantage inconsistent with official duty and the rights of others; a fiduciary's or official's use of a station or office to procure some benefit either personally or for someone else, contrary to the rights of others.

36

*Black's Law Dictionary* 397 (9th ed. 2009).   In the context of the statute prohibiting

obstruction of justice, the Eleventh Circuit defined "corruptly" as meaning "done with the

intent to secure an unlawful benefit either for oneself or for another."   *United States v.*

*Popkin*, 943 F.2d 1535, 1540 (11th Cir. 1991).  The Ninth Circuit has held that "corruption,"

as used in the RLA, refers to three types of misconduct – each relating to a "threat" to "the

integrity of arbitral proceedings" –

> First, corruption includes acts that threaten the integrity of arbitral
> proceedings that are either quasi-criminal or criminal in nature, including, but
> not limited to, acts of violence or threats thereof. Second, corruption
> encompasses acts of bribery and extortion that threaten the integrity of arbitral
> proceedings, the latter of which includes, but is not limited to, threats of
> economic injury. Third, corruption extends to similarly egregious abuses of
> office that threaten the integrity of arbitral proceedings.  Additionally, as with
> fraud under the RLA, corruption must be proven by clear and convincing
> evidence.

*United Transp. Union v. BNSF Ry. Co.*, 710 F.3d 915, 932 (9th Cir. 2013)(footnotes

omitted).

The court now holds that corruption sufficient to impeach an award under the RLA

requires a showing, by clear and convincing evidence, that "a member of the board of

arbitration" or a party engaged in corruption – defined as an act of violence, a threat of

violence, extortion, a threat of economic injury, gross impropriety, or abuse of office with

the intent to alter the result of the arbitration proceeding – and that the substance of the

arbitration proceeding was thereby affected by the acts of the member of the board of

arbitration and/or party.[8]   A mere "appearance of impropriety" is not sufficient to establish corruption for purposes of impeaching an award.  *See Pac. & Arctic Ry.*, 952 F.2d at 1148 ("An appearance of impropriety is not sufficient to establish bias under the Arbitration Act." (citing *Toyota of Berkeley v. Automobile Salesmen's Union*, 834 F.2d 751, 755 (9th Cir. 1987))).

BSR contends that Zamperini's conduct fits within the definitions of corruption because she showed "favoritism" and "partiality" and was "biased" toward UTU based on her secret and *ex parte* communications.  Assuming this were true, this misconduct falls short of corruption.  Although arbitrators should refrain from soliciting any *ex parte* information from either side, BSR has not established that the information exchanged during the so-called secret proceedings and ex parte communications was intended to alter the results of the Interpretation proceedings on behalf of UTU through illegal or improper means or that the communications had such an effect on the Interpretation.

The Arbitration Agreement between the parties provided Board 594 authority to clarify Award No. 1 through an interpretation.  Moreover, although BSR strenuously argues that the Interpretation went far afield of Award No. 1, the plain and unambiguous language

---

[8]Under the Federal Arbitration Act, an arbitration award may be impeached upon a showing that (1) "the award was procured by corruption, fraud, or undue means," or (2) "there was evident partiality or corruption in the arbitrators, or either of them."  9 U.S.C. § 10 (a)(1)-(2).

of the Interpretation tracks the language of Award No. 1. The Interpretation is not based on any new evidence not considered in Award No. 1. The Interpretation states:

> After reviewing the language provided by the parties and included as part of the Award issued by Special Board of Adjustment 591, the Board concluded that the Cost-of-Living Adjustments negotiated by the parties in that language were to be rolled into the basic wage rates without regard to the National Agreement's handling of the COLA payments. The majority Board Award directed that all negotiated COLA payments paid to employees were to become a permanent part of employee wages and were not to be [recouped] by the Carrier.

(Doc. 1-1.) The Interpretation is based on the clear, unambiguous language of Award No. 1, which stated, "[T]he language implemented by Award 1, Arbitration Board 591, established that the three COLA payments would be rolled into the basic rates of pay on specific dates without regard to the National Agreement's handling of the COLA payments." (Doc. 1-2 at 5-6.) Thus, the Interpretation's statement that Award No. 1 made COLA payments "a permanent part of employee wage" is clearly based on the language of Award No. 1. Nothing in the Interpretation even hints that it was the product of corruption, rather than the plain and unambiguous language of Award No. 1.

### 4. Petition to Enforce

In opposition to UTU's Motion for Summary Judgment, BSR contends:

> UTU's complaint should be dismissed for the threshold reason that RLA § 9 does not vest this Court with jurisdiction to entertain an independent civil action seeking enforcement of the purported November 21, 2011[,] interpretation. UTU relies on 45 U.S.C. § 159 Second, which provides that a court may enter judgment on a properly filed award unless a timely petition to

impeach the award is filed.  BSR did file a timely petition to impeach the November 21, 2011[,] interpretation, so 45 U.S.C. § 159 Second does not authorize the Court to enter judgment on the interpretation.  Nothing else in RLA § 9 authorizes UTU's civil action.  RLA § 9 Third provides only for a "petition for the impeachment or contesting of any award" of a § 7 Board, on the grounds specified in that section.  Congress knows how to provide for a petition to enforce.  It did so in 45 U.S.C. § 153 First (p) ("If a carrier does not comply with an order of a division of the [National Railroad] Adjustment Board . . . the petitioner . . . may file in the District Court . . . a petition setting forth briefly the causes for which he claims relief . . . .").  But Congress did not provide for the bringing of a civil action to enforce an award in RLA § 9.

> Section 3 First (p) certainly provides no authority for UTU's Complaint. By its express terms, that section authorizes only a petition to enforce an award issued by an arbitration board created under RLA § 3.  It has no application to an award issued by an arbitration board established under RLA § 7, like Board 594.

(Doc. 60 at 72-73.)  The court disagrees with BSR's reasoning.

Section 159 Second provides:  "An award acknowledged and filed as herein provided shall be conclusive on the parties as to the merits and facts of the controversy submitted to arbitration, and unless, within ten days after the filing of the award, a petition to impeach the award, on the grounds hereinafter set forth, shall be filed in the clerk's office of the court in which the award has been filed, the court shall enter judgment on the award, which judgment shall be final and conclusive on the parties."  45 U.S.C. § 159 Second.  Section 153 First (p) provides:

> If a carrier does not comply with an order of a division of the Adjustment Board within the time limit in such order, the petitioner, or any person for whose benefit such order was made, may file in the District Court of the United States for the district in which he resides or in which is located the principal operating office of the carrier, or through which the carrier operates, a petition setting forth briefly the causes for which he claims relief, and the

40

order of the division of the Adjustment Board in the premises.   Such suit in the District Court of the United States shall proceed in all respects as other civil suits, except that on the trial of such suit the findings and order of the division of the Adjustment Board shall be conclusive on the parties, and except that the petitioner shall not be liable for costs in the district court nor for costs at any subsequent stage of the proceedings, unless they accrue upon his appeal, and such costs shall be paid out of the appropriation for the expenses of the courts of the United States.  If the petitioner shall finally prevail he shall be allowed a reasonable attorney's fee, to be taxed and collected as a part of the costs of the suit.  The district courts are empowered, under the rules of the court governing actions at law, to make such order and enter such judgment . . . as may be appropriate to enforce or set aside the order of the division of the Adjustment Board . . . .

45 U.S.C. § 153 First (p).   "The Court finds that it may look to the standards articulated in cases decided under section 3 [45 U.S.C. § 153] as Congress clearly intended to make the scope of judicial review in section 3 identical to that provided in section 9 [45 U.S.C. § 159] despite the more circumscribed language in section 3.  *Maine Cent. R. Co. v. Brotherhood of Maintenance of Way Employees*, 663 F. Supp. 425, 428 (D. Me. 1987)(citing S. Rep. No. 1201, 89th Cong. 1st Sess., *reprinted in 1966 U.S. Code Cong. & Admin. News* 2285, 2287 ["The limited grounds for judicial review provided in [the present amendment to section 3] are the same grounds that are provided in section 9 of the Railway Labor Act . . . ."]; H.R. Rep. No. 1114, 89th Cong. 1st Sess. 15-16, *reprinted in* Subcomm. on Labor, Comm. on Labor & Public Welfare, U.S. Senate, *Legislative History of the Railway Labor Act, As Amended (1926 through 1966)*, at 1321-22 (1974)[the three tests for judicial review under section 3 are "the tests traditionally applicable to awards of arbitration tribunals, as set out in section 9 of the Railway Labor Act."]).

41

The court holds that it is empowered to enter judgment for UTU as may be appropriate to enforce the Interpretation.  The court rejects BSR's interpretation of § 159 Second as barring a district court from enforcing an Award if an unmeritorious petition to impeach is filed.  The court interprets the language of § 159 to require only that the court resolve a petition to impeach before finding the Award to be conclusive and binding between the parties.

The court finds that the Interpretation conclusively establishes that the three COLA payments set forth in the parties Agreement and incorporated by Board 591's Award, which became a permanent part of the employees' basic wage rates, cannot be recouped.  To the extent that BSR withheld employees' basic wages or reduced employees' basic wage rates in an amount equal to one or more of the three COLA payments set forth in the Award of Board 591, these amounts are due and owing to the employees.

For the reasons set forth above, the court finds that BSR's Counterclaim seeking to impeach the Interpretation is without merit and due to be dismissed.  Therefore, the court will enter judgment on the Interpretation.  UTU's Motion for Summary Judgment on its Petition to Enforce will be granted against BSR.

However, to the extent UTU seeks judgment as a matter of law based on the Interpretation against defendant Transtar, its Motion for Summary Judgment will be denied.  Transtar was not a party to the Interpretation and, therefore, the Interpretation cannot be

enforced against it.  UTU's Motion for Summary Judgment will be denied to the extent it

seeks a Judgment based on the Interpretation against Transtar.

## IV.  BSR AND TRANSTAR'S MOTION FOR SUMMARY JUDGMENT

### A.  BSR

For the reasons set forth above, the court finds that UTU is entitled to judgment as a

matter of law on its Petition to enforce the Interpretation and BSR's Counterclaim Petition

to Impeach the Interpretation.  Therefore, BSR's Motion for Summary Judgment will be

denied.

### B.  TRANSTAR

In its Petition to Enforce Interpretation, UTU alleges, "On information and belief,

Transtar, through its operation and control[,] will sell all [BSR's] assets and operations, but

remains obligated to resolve all outstanding debts and liabilities of [BSR] not transferred or

assumed by WATCO/BTR."  (Doc. 1 ¶ 31.)  It asks the court to "[i]ssue injunctive relief

requiring . . . Transter . . . to fully comply with . . . the Award and Interpretation issued by

Board 594," and to "[d]irect . . . Transtar make all appropriate payments thereunder."  (*Id.*

at 5-6.)  In their Motion for Summary Judgment, BSR and Transtar contend:

> The claims asserted against Transtar should be dismissed for the
> additional threshold reason that Transtar has no employees represented by
> UTU and no collective bargaining agreements with UTU; and Transtar was not
> a party to either the September 17, 2008 Arbitration Agreement or the
> arbitration proceeding that resulted in Board 594's Award No. 1, and is not
> covered by the terms of either Award No. 1 or the purported November 21,
> 2011 interpretation.  UTU does not allege otherwise.  The RLA therefore does
> not authorize UTU's seeking relief as against Transtar.

(Doc. 46 at 56.)  In response, UTU contends, "BSR's and Transtar's counsel by email[, (doc. 63-1 at 2),] and statement in open court, admitted that Transtar would be financially responsible."  (Doc. 63 at 17.)

Whether Transtar has an agreement with BSR and UTU that it will pay any Judgment resulting from this litigation on behalf of BSR, however, does not give this court authority to enter a Judgment against Transtar based on the Interpretation to which it was not a party and by which none of its employees were covered.  This court makes no determination as to whether Transtar is obligated to UTU based on a separate agreement between and among the parties.

BSR and Transtar's Motion for Summary Judgment as to UTU's Petition to enforce the Interpretation against Transtar will be granted and the Petition will be dismissed as to Transtar.

## C.  <u>CONCLUSION</u>

For the foregoing reasons, the court is of the opinion that UTU's Motion for Summary Judgment, (doc. 51), is due to be granted in part and denied in part.  The motion will be granted as to UTU's Petition to Enforce against BSR and on BSR's counterclaim;  UTU's Summary Judgment Motion as to the Petition to Enforce against Transtar will be denied. Zamperini's Motion for Summary Judgment, (doc. 48), is due to be granted.  BSR and Transtar's Motion for Summary Judgment, (doc. 45), is due to be granted in part and denied in part.  BSR and Transtar's Motion will be granted as to UTU's Petition to Enforce the Interpretation against Transtar; it will be denied in all other respects.

An order in accordance with these findings will be entered contemporaneously with this Opinion.

**DONE**, this 31st day of March, 2014.


_Sharon Lovelace Blackburn_
SHARON  LOVELACE  BLACKBURN
UNITED STATES DISTRICT JUDGE